**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

MATT MADDOCK,

              Plaintiff,

v.

MICHIGAN HOUSE OF
REPRESENTATIVES, et al.,

           Defendants.

Case No. 1:24-cv-00257-RJJ-SJB

Hon. Robert J. Jonker

Magistrate Judge: Sally J. Berens

---

**<u>DEFENDANTS' COMBINED BRIEF IN SUPPORT OF MOTION TO DISMISS AND
RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................5

  I     A Brief History of State-Funded Mailing for Official Legislative Purposes. .................5

  II.    Michigan's Legislative Council and House of Representatives Adopt Printing Rules Allowing Legislators to Use Taxpayer Resources for "Official Legislative Business." ..7

      A. The Legislative Council Rules. ................................................................7

      B. The House Printing Guidelines. ...............................................................9

  III.   The House Permits Representatives to Freely Engage in Speech Involving Matters Other than "Official Legislative Business" When State Resources Are Not Used, and Plaintiff Continues to Do So. ..................................................................................10

  IV.   Plaintiff Attempts to Engage in Speech that Violates the Printing Rules While Using State Resources. ...................................................................................12

  V.    Plaintiff Files this Lawsuit. .........................................................................13

ARGUMENT ......................................................................................................14

  I.    PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.............14

      A. Legal Standards. ..................................................................................14

      B.  Plaintiff's Claims Against the House of Representatives and House Business Office, and the Official Capacity Claims for Retrospective Damages Against the Individual Defendants, Are Barred by Sovereign Immunity. ....................................................15

      C. Plaintiff Has Failed to State a Claim Under the United States or Michigan Constitutions. ............................................................................................16

          1.    The Printing Rules Are Not Subject to the First Amendment Because they Regulate Government Speech. .................................................................16

          2.    The Printing Rules Satisfy Constitutional Scrutiny .........................................21

             a. The Printing Rules Include Content-Based Criteria that Satisfy Rational Basis Review ..........................................................................................22

             b. The Printing Rules Do Not Impose a Prior Restraint .................................25

             c. This Court Should Decline to Serve as the Arbiter of What Does and Does Not Qualify as Official Legislative Business ...............................................26

      D. The Individual Capacity Claims Are Barred by Qualified Immunity ......................27

      E. Plaintiff Has Failed to Plead Sufficient Facts Tying Defendant McCann to the Claims Alleged in the Complaint. .............................................................................28

  II. PLAINTIFF'S   MOTION   FOR   PRELIMINARY   INJUNCTION   SHOULD   BE DENIED. ...................................................................................................28

      A. Legal Standards. ..................................................................................28

B.  Plaintiff Is Not Likely to Succeed on the Merits ........................................................29

C.  Plaintiff Will Not Suffer Irreparable Harm Absent Injunctive Relief. ......................29

D.  Defendants Will Be Harmed if Injunctive Relief is Granted ...................................30

E.  The Public Will be Harmed if Injunctive Relief is Granted. ....................................31

III. PLAINTIFF'S REQUEST FOR A STAY PENDING APPEAL SHOULD BE DENIED ............................................................................................................................31

CONCLUSION .............................................................................................................................32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Acrisure, LLC v. Edgewood Partners Ins. Ctr.*,
2019 U.S. Dist. LEXIS 244770 (W.D. Mich. Mar. 11, 2019) ............................................... 29, 30

*Alexander v. United States*,
509 U.S. 544 (1993) ........................................................................................................................ 25

*Am Ass'n of Political Consultants v. United States SBA*,
810 F. App'x 8 (D.C. Cir. 2020) .................................................................................................. 22

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) ........................................................................................................................ 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................................ 15

*Brooks v. Roberts*,
251 F. Supp. 3d 401 (N.D.N.Y. 2017) ....................................................................................... 30

*Children's Healthcare is a Legal Duty v. Deters*,
92 F.3d 1412 (6th Cir. 1996) ........................................................................................................ 16

*Common Cause v. Bolger*,
574 F. Supp. 672 (D.D.C. 1982) ........................................................................................... passim

*Courser v. Mich. House of Representatives*,
831 F. App'x 161 (6th Cir. 2020) ...................................................................................... 3, 15, 16

*Davenport v. Washington Educ. Ass'n*,
551 U.S. 177 (2007) ........................................................................................................................ 22

*Déjà Vu - San Francisco, LLC v. United States SBA*,
2020 U.S. Dist. LEXIS 199308 (N.D. Cal. Sept. 11, 2020) ...................................................... 26

*DLX, Inc. v. Kentucky*,
381 F.3d 511 (6th Cir. 2004) ........................................................................................................ 15

*Ex parte Young*,
209 U.S. 123 (1908) ........................................................................................................................ 16

*Fields v. Speaker of the Pa. House of Representatives*,
936 F.3d 142 (3d Cir. 2019) .......................................................................................................... 19

*Gerber v. Herskovitz*,
No. 19-13726, 2022 U.S. Dist. LEXIS 67439 (E.D. Mich. Apr. 11, 2022)................................ 32

*Gravel v. United States*,
408 U.S. 606 (1972)................................................................................................................ 27

*Interpipe Contr. v. Becerra*,
898 F.3d 879 (9th Cir. 2018) ................................................................................................. 22

*Machete Prods., L.L.C. v. Page*,
809 F.3d 281 (5th Cir. 2015) ................................................................................................. 25

*Malisjewski v. Geerlings*,
226 N.W2d 534 (Mich. Ct. App. 1974) .................................................................................. 26

*Matal v. Tam*,
582 U.S. 218 (2017)............................................................................................................... 24

*Mech v. School Bd. of Palm Beach Cnty.*,
806 F.3d 1070 (11th Cir. 2015) ............................................................................................. 17

*Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*,
945 F.2d 150 (6th Cir. 1991) ................................................................................................. 32

*Mullins v. Cyranek*,
805 F.3d 760 (6th Cir. 2015) ................................................................................................. 27

*Norris v. Stanley*,
567 F. Supp. 3d 818 (W.D. Mich. 2021) ................................................................................ 30

*Novak v. City of Parma*,
932 F.3d 421 (6th Cir. 2019) ................................................................................................. 25

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't*,
305 F.3d 566 (6th Cir. 2002) ................................................................................................. 29

*Patio Enclosures, Inc. v. Herbst*,
39 F. App'x 964 (6th Cir. 2002) ............................................................................................ 29

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009)................................................................................... 2, 17, 20, 21

*Pulphus v. Ayers*,
249 F. Supp. 3d 238 (D.D.C. 2017) .............................................................................. 17, 20

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)............................................................................................................... 23

iv

*Regan v. Taxation with Representation*,
461 U.S. 540 (1983) ............................................................................... 3, 22

*Reichle v. Howards*,
566 U.S. 658 (2012) ..................................................................................... 27

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995) ..................................................................................... 23

*Russell v. Lundergan-Grimes*,
784 F.3d 1037 (6th Cir. 2015) ..................................................................... 15

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*,
860 F.3d 844 (6th Cir. 2017) ................................................................. 28, 29

*Saucier v. Katz*,
533 U.S. 194 (2001) ..................................................................................... 27

*Shurtleff v. City of Boston*,
142 S. Ct. 1583 (2022) ............................................................. 17, 18, 20, 22

*Small Bus. in Transp. Coal. v. Bowser*,
2023 U.S. App. LEXIS 8047 (D.C. Cir. Apr. 4, 2023) ................................ 17

*Univ. of Texas v. Camenisch*,
451 U.S. 390 (1981) ..................................................................................... 28

*Urban Justice Ctr. v. Silver*,
66 A.D.3d 567 (N.Y. Ct. App. 2009) ................................................... passim

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ................................................................................ 17, 20

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009) ..................................................................................... 22

**Statutes**

15 U.S.C. § 1052(a) ........................................................................................ 24

39 U.S.C. § 3210(a)(1) ..................................................................................... 6

39 U.S.C. § 3210(a)(3) ..................................................................................... 6

39 U.S.C. § 3210(a)(4) ..................................................................................... 6

39 U.S.C. § 3210(a)(5) ..................................................................................... 6

39 U.S.C. § 3210(a)(5)(A) ................................................................................ 24

Mich. Comp. Laws § 169.221 ......................................................................... 10

**Other Authorities**

Amy B. Wang, *GOP lawmaker warns of 'civil war' at fundraiser for indicted Trump electors*, WASHINGTON POST (Aug. 11, 2023). ........................................................... 3

Beth Leblanc, *GOP lawmaker slams 'illegal invaders' at Detroit airport. It was the Sweet 16 teams*, DETROIT NEWS (Mar. 28, 2024). .................................................... 3

*Franking Privilege: Historical Development and Options for Change* (hereafter, "*Franking Privilege*"), CONGRESSIONAL RESEARCH SERVICE (May 3, 2016). ..................... 5, 6, 8

*Journals of the Continental Congress, 1774-1789* ......................................... 5

*Michigan Committee Statement Summary Page*, MICH. SECRETARY OF STATE (last visited April 16, 2024) ......................................................................................... 10

Paul Egan, *Activist who organized buses to DC about to take Mich. GOP Role*, DETROIT FREE PRESS (Jan. 7, 2021) ................................................................................. 3

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................... 14, 15

Fed. R. Civ. P. 12(b)(6) ................................................................................. 14

Michigan House of Representatives Rules……..……………………………………..27

**Constitutional Provisions**

U.S. Const., amend I……………………………………………………………… passim

Mich. Const. art. IV, § 15 ............................................................................... 7

## INTRODUCTION

Dating back to the founding, the "franking privilege" has provided members of Congress government funds to communicate with constituents on matters of official government business. "The clear purpose" to "which the frank has been extended over the past 200 years," as "it is today, was to facilitate the carrying on of official business" that is "related directly to the legislative and representative functions of Congress." *Common Cause v. Bolger*, 574 F. Supp. 672, 674, 683 (D.D.C. 1982). "Unofficial" business—such as communications "which are on their face political"—falls "[a]t the other extreme," and legislators have long been "excluded" from using government funds for such purposes. *Id.* at 683.

Mirroring this centuries-old privilege afforded to members of Congress, Michigan's legislators also receive state funds and resources to communicate with constituents. Like their federal counterpart, these resources are restricted to matters of "official legislative business," and cannot be used for "personal or partisan material of any nature." (Legislative Council Rules at 31-32, **Ex. 1**.) The internal rules governing these communications—which have largely gone unchanged and unchallenged through numerous shifts in political control—set parameters for what is considered "official legislative business." In doing so, they identify "negative comments about the institution of the legislature or a specific legislator" and comments that "[i]mpugn motives of legislators or other individuals" as "examples" of content that falls outside the scope of official legislative business, and that will not be subsidized with taxpayer resources.

Faced with these well-established standards, Plaintiff Matt Maddock sought approval to use taxpayer resources to publish a "newsletter" that, in his view, bears "stark parallels with the Declaration of Independence" and, in the view of others, may be best described as a political manifesto that is entirely unrelated to the "legislative and representative functions" of

1

Michigan's House of Representatives (the "House").  Among (many) other things, it refers to an "Imperial Governor" who is "a Tyrant," states that "Democrats . . . are militant ideologues," and contends the "left-wing campaign machinery is in place to prop" up the "wildly unpopular" and "clearly senile" President.  Plaintiff claims he was "shocked and surprised" when this newsletter was not published with official House resources.  And in response, he filed this lawsuit claiming that the Legislative Council Rules and House Printing Guidelines (together, the "Printing Rules") violate his First Amendment rights.  For several reasons, his Complaint should be dismissed with prejudice, and his motion for preliminary injunction should be denied.

*First*, the Complaint suffers from the threshold problem that the Printing Rules are not subject to the First Amendment to begin with.  They govern communications from legislators that (1) are made in their official representative capacities, (2) concern matters of "official legislative business", (3) are paid for with government funds and prepared using government resources, and (4) are either distributed through official government email accounts linked to the House, or through hard-copy mailings that are required to state: "Prepared by the Michigan Legislature."  This is quintessential government speech.  And it is therefore exempt from First Amendment scrutiny altogether.  *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009)

*Second*, even if the First Amendment did apply, that Amendment only prohibits laws that abridge the freedom of speech.  The Printing Rules do not do so.  They simply include content-based restrictions that ensure speech prepared with government resources, sent from the government itself, and subsidized by taxpayer funds pertains to "official legislative business." Plaintiff is (and always has been) free to speak on matters that are unrelated to "official legislative business" and, so long as he doesn't seek government assistance, he is unrestrained by the Printing Rules when doing so.  Consistent with that, both before and after this case was filed,

Plaintiff has continued to engage in this speech on social media,[1] while fundraising within the State,[2] and while engaging in activity in the nation's Capitol.[3]  Thus, even if the Printing Rules were somehow regulating private (rather than government) speech, at most, they regulate what speech the government will pay for.  Case law is clear that a "legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right."  *Regan v. Taxation with Representation*, 461 U.S. 540, 549 (1983) (citation omitted).  And in this specific context, courts have either declined to interfere with a legislature's decision as to what does and does not qualify as official legislative business, or determined that identical content-based restrictions pass First Amendment scrutiny.  *Urban Justice Ctr. v. Silver*, 66 A.D.3d 567, 570 (N.Y. Ct. App. 2009).

*Third*, setting all that aside, all of Plaintiff claims against the House and House Business Office, as well as his claims for money damages against the individual defendants, are barred by sovereign immunity.  *Courser v. Mich. House of Representatives*, 831 F. App'x 161, 170-71 (6th Cir. 2020).  And, even if this Court were to make a first-of-its-kind ruling that internal state legislative procedures regulating government speech violated the First Amendment, Defendants would still be entitled to qualified immunity for the individual capacity claims because this purported First Amendment right is not "clearly established."

*Fourth* are the pleading deficiencies.  Plaintiff has failed to allege any facts linking

---

[1] Beth Leblanc, *GOP lawmaker slams 'illegal invaders' at Detroit airport.  It was the Sweet 16 teams*, DETROIT NEWS (Mar. 28, 2024), https://www.detroitnews.com/story/news/politics/2024/03/28/gop-state-lawmaker-matt-maddock-confuses-ncaa-teams-for-illegal-invaders-in-detroit/73135471007/.

[2] Amy B. Wang, *GOP lawmaker warns of 'civil war' at fundraiser for indicted Trump electors*, WASHINGTON POST (Aug. 11, 2023), https://www.washingtonpost.com/national-security/2023/08/11/michigan-civil-war-gop-fundraiser/.

[3] Paul Egan, *Activist who organized buses to DC about to take Mich. GOP Role*, DETROIT FREE PRESS (Jan. 7, 2021), https://www.freep.com/story/news/politics/elections/2021/01/07/capitol-riot-meshawn-maddock-michigan-republican-cochair/6577739002/

Defendant McCann to the rejection of his newsletter.  The exhibits attached to Plaintiff's Complaint show that Plaintiff's office communicated with a single Defendant.  And there is no valid basis to otherwise include the Speaker of the House's Press Secretary as a defendant.

*Finally*, Plaintiff's request for a preliminary injunction should be denied because, for all of the above reasons, he is unlikely to succeed on the merits.  But even if the Court had questions on the merits, injunctive relief would still be unwarranted.  To the extent the First Amendment applies at all, the issue here is not whether Plaintiff can engage in speech.  It's whether taxpayers should be required to pay for it.  Because Plaintiff is free to self-fund any speech that he chooses, monetary expenses incurred in doing so are not "irreparable."  Moreover, the House Defendants would face harm if a federal court were to intrude on matters left to the legislature, and "in effect . . . issue rules of behavior superseding those" issued by "a coordinate branch of government." *Bolger*, 574 F. Supp. at 685.  And it is in the public's interest to ensure their tax dollars are used for official business, rather than to endorse partisan tirades.

In summary, Plaintiff's lawsuit not only runs contrary to the First Amendment's text and teachings, but it is also extraordinary on its face.  Consistent with long-standing practice, a state constitutional body (the Legislative Council) and a state legislature have reasonably limited the use of state resources to content pertaining to "official legislative business."  Plaintiff ignores the government speech doctrine entirely, and then asks this Court to second-guess the legislature's judgment as to what qualifies as "official legislative business," and require that the House use taxpayer-funded resources to publish a newsletter that, by any standards, comes nowhere near that line.  Respectfully, this Court should decline to do so.  Plaintiff's motion for preliminary injunction should be denied, his Complaint should be dismissed with prejudice, and judgment should enter in Defendants' favor.

# BACKGROUND

## I.   A Brief History of State-Funded Mailing for Official Legislative Purposes.

"The franking privilege, which allows Members of Congress to transmit mail matter under their signature without postage," predates the First Amendment and "has existed in the United States since colonial times."[4]  The First Continental Congress passed legislation providing members with mailing privileges to communicate with their constituents in 1775.  *Id.* (citing *Journals of the Continental Congress, 1774-1789*).  These privileges "played an important role in national politics during the early 19th century" and allowed members to "mail[] copies of acts, bills, government reports, and speeches, serving as a distributor for government information and a proxy for the then non-existent Washington press corps."  *Id.* at 2 (citations omitted).  "The clear purpose then, as it is today, was to facilitate the carrying on of official business."  *Bolger*, 574 F. Supp. at 674.

Due to a "perception of abuse," Congress abolished the franking privilege in 1873. *Franking Privilege*, at 3 (citing Act of Congress, Jan. 31, 1873, 17 Stat. 421; Act of Congress, Mar. 3, 1873, 17 Stat. 559).  When the privilege was restored in 1895, Congress permitted members to send correspondence of "official or departmental business."  *Id.* at 4 (citing Act of Congress, Jan. 12, 1895, 28 Stat. 601, 622 §§ 85, 86).  The scope of "official business" was limited to items such as "department documents to be forwarded and related correspondence," and remained so until 1961, when legislation passed allowing each chamber to impose different franking policies.  *Id.* (citing P.L. 88-248, 77. Stat. 803).  At that time, the United States House

---

[4] *Franking Privilege: Historical Development and Options for Change* (hereafter, "*Franking Privilege*"), Congressional Research Service (May 3, 2016), available at https://crsreports.congress.gov/product/pdf/RL/RL34274/20#:~:text=The%20franking%20privilege%2C%20which%20allows,United%20States%20since%20colonial%20times.

of Representatives ("U.S. House") indicated the new law would help members deliver "information on the issues pending before Congress," meaning that "newsletters, questionnaires, and constituent reports might now be included in 'official business.'" *Id.* at 4.

The original "responsibility to interpret the meaning of the term 'official business' was exercised by the Post Office Department," which was tasked with providing "official guidance in the form of advisory opinions as to whether a mailing or contemplated mailing could be franked." *Bolger*, 574 F. Supp. at 674. Eventually, the Post Office Department "relinquished" this responsibility and, in 1973, a new comprehensive franking law passed, which created a "Franking Commission" to "oversee the use of the frank in the House. *Franking Privilege*, at 5; *Bolger*, 574 F. Supp. at 674-75. This statute created a "list of what the Congress considered to be frankable mail matter" along with "unauthorized uses of the frank." *Bolger*, 574 F. Supp. at 675. And it established commissions within the U.S. House and Senate to "provide guidance, assistance, advice, and counsel, through advisory opinions or consultations, in connection with the mailing or contemplated mailing of franked mail," and to investigate and adjudicate complaints over alleged abuses of the privilege. *Id.* "Each House of Congress" then "enacted formal rules which set further limits on the kind of material which may be franked." *Id.*

In its present form, the "privilege of sending mail as franked mail" remains limited to "the official business, activities, and duties of" Congress. 39 U.S.C. § 3210(a)(1). Congress has defined the "mail matter which is frankable" to both include and exclude specific items. *Id.* §§ 3210(a)(3), (5). And it has stated that franked mail may not be used for any matter "which in its nature is purely personal to the sender or to any other person and is unrelated to the official business, activities, and duties of the public officials. *Id.* §§ 3210(a)(4), (a)(5).

II.  **MICHIGAN'S LEGISLATIVE COUNCIL AND HOUSE OF REPRESENTATIVES ADOPT PRINTING RULES ALLOWING LEGISLATORS TO USE TAXPAYER RESOURCES FOR "OFFICIAL LEGISLATIVE BUSINESS."**

Similar to the congressional frank, Michigan's legislators are allotted state funds for printing and mailing constituent communications.  The guidelines concerning the use of these funds are set forth in the "Legislative Council Rules" and the "House Printing Guidelines."[5]

A.  **The Legislative Council Rules.**

The Michigan Legislative Council is a bipartisan, bicameral, constitutionally-created body of legislators, Mich. Const. art. IV, § 15, that is tasked with implementing the guidelines concerning the use of the Legislative Service Bureau's printing and mailing equipment.  (*See* Legislative Council Rules at 9, 31, **Ex. 1**.[6])  The Legislative Council Rules provide that "[t]he Legislative Service Bureau's printing and mailing equipment shall be used for official legislative business only"—which is "deemed to include all issues of statewide interest or of general interest to an entire legislative district."  (*Id.* at 31.)  The Rules further make clear that the "use of legislative equipment for the printing of personal or partisan material of any nature for a legislator is strictly prohibited."  *Id.*

These Rules expressly identify the "material authorized to be printed."  (*Id.* at 34-35.)  This includes newsletters, legislative summations, questionnaires, "newspaper clippings that are

---

[5] In practice, hard-copy mailings are processed by the Legislative Service Bureau ("LSB"), which (after the House has reviewed the content) reviews the mailings for compliance with the Legislative Council Rules.  (House Printing Guidelines, ECF No. 1-3, PageID.25 ("Printing requests processed through the LSB print shop are also subject to rules established by the LSB Print Shop.").)  The Legislative Service Bureau is not involved in requests for approval of electronic mailings, but the House still reviews such requests for compliance with both the Legislative Council Rules and House Printing Guidelines (which are materially similar) before official House email accounts with a "house.mi.gov" address are used to distribute e-newsletters. (*Id.* ("All newsletters . . . must conform to House and Legislative Service Bureau guidelines.").)

[6] Exhibit 1 to the Complaint is an excerpt of the Legislative Council's Rules.  (ECF No. 1-1.)  The House Defendants attach the Rules pertaining to printing in full.

not political or personal in nature," legislative committee reports, neutral explanations of statewide ballot issues that do not advocate for a particular position, and news releases.  (*Id.*)

The Rules also provide examples of material that is "not authorized to be printed."  (*Id.* at 32, 35-37.)  Among other things, the Rules prohibit the use of taxpayer funds for:

- Information that is personal in nature or otherwise unrelated to the work of the legislature.  (*See, e.g.*, *id.* (prohibiting "[n]ewspaper clippings that are political or personal in nature," "[p]ersonal reports on the family or family life of a legislator or legislative staff member," and "minutes, reports, or newspapers of outside organizations or clubs").)

- "Listings or indications of endorsements of a legislator."  (*Id.* at 35.)

- Campaign- and fundraising-related communications.  (*See, e.g.*, *id.* at 36-37 (identifying "[s]olicitations for or on behalf of a political program or organizations", campaign logos, and "[r]eferences to past or future campaigns")); and

- Disparaging remarks and rhetoric about the legislature or individual legislators.  (*Id.* at 32 (prohibiting "negative comments about the institution of the legislature or a specific legislator").)

The Rules further require that:

**The following notice shall be included on all newsletters:**

***Prepared by the Michigan Legislature***

(*Id.* at 40 (bold emphasis added).)

As these examples show, similar to the federal privilege, the purpose of these taxpayer-funded communications is to allow legislators to provide constituents with informative updates on the legislators' work for their constituents and the issues pending before the legislature.  *See Franking Privilege*, at 2 (the privilege "serv[es] as a distributor for government information").  It is not designed to fund advocacy or rhetoric that is best left for the campaign trail.

8

### B. The House Printing Guidelines.

Also similar to Congress's decision to delegate the question of what qualifies as "official legislative business" rather than "partisan" advocacy to each chamber, the Legislative Council Rules state that "[t]he text for printing requests for members of the House shall be reviewed under procedures authorized by the Speaker of the House[.]" (Legislative Council Rules at 31-32.) These procedures were established in 2001 and, in the more than 20 years since then, have mostly gone unchanged and unchallenged through numerous shifts in political control. (*See, e.g.*, Compl. ¶ 20, PageID.5 (recognizing the "Printing Rules and Printing Guidelines have been in place for some time").)

The House Printing Guidelines currently prohibit "[t]he use of House computers (including email and the network), printing and mailing equipment for any use other than official legislative business" and, like the Legislative Council Rules, defines "official legislative business" as "deemed to include all issues of statewide interest or of general interest to an entire legislative district." (House Printing Guidelines, ECF No. 1-3, PageID.26.) Also like the Legislative Council Rules, the House Printing Guidelines "strictly prohibit[]" the "use of legislative equipment for the printing of personal or partisan material of any nature." (*Id.*) And, while the House Printing Guidelines do not list the "material authorized to be printed," they also include specific "[e]xamples of prohibited printed or electronic material" that largely track the Legislative Council Rules. (*Id.* at PageID.26-28.) As relevant here, they prohibit:

- "Solicitations of political support for a legislator or any person or political party." (*Id.* at PageID.26.)

- Attacks on specific legislators or the legislature. (*Id.* (prohibiting "[c]omments critical of the institution of the legislature, legislators or other individuals" and comments that "[i]mpugn motives of legislators or other individuals, or accusations of intentional misrepresentation.")); and

9

- Discussion of "[i]ssues intending to influence pending court cases" or "[i]ssues related to a pending court case unless the issue is directly before the legislature." (*Id.* at PageID.28.)

"[A]ll newsletters . . . whether printed or electronic, must be reviewed by the House Business Office and the Speaker's office prior to the information being released to the public." (*Id.* at PageID.25.)  And if, "for any reason, a specific question is not covered in these guidelines, the issue will be resolved at the discretion of the Speaker or the Speaker's designee."  (*Id.*)

### III.   THE HOUSE PERMITS REPRESENTATIVES TO FREELY ENGAGE IN SPEECH INVOLVING MATTERS OTHER THAN "OFFICIAL LEGISLATIVE BUSINESS" WHEN STATE RESOURCES ARE NOT USED, AND PLAINTIFF CONTINUES TO DO SO.

As shown above, the Printing Rules only come into play when Representatives seek to communicate with their constituents *using taxpayer-funded resources*.  In that instance, there is an overarching requirement that the communications must pertain to matters of "official legislative business."  Importantly, if Representatives wish to speak on matters unrelated to official legislative business, they are free to do so, and are unburdened by the Printing Rules; the House just won't pay prepare, pay for, or distribute the speech through official government channels.  Still, Representatives can still raise money to fund any partisan or other speech through candidate committees—meaning taxpayers who wish to fund these communications have the option, but not the obligation, to do so.[7]  *See* Mich. Comp. Laws § 169.221.

House policies make this abundantly clear.  Indeed, as to one example of material that falls outside the Printing Rules' definition of "official legislative business," the House "Office Procedures & Use of State Resources" manual expressly states that Representatives "may speak

---

[7] Publicly-available campaign finance statements indicate Plaintiff has over $60,000 available in his campaign account.  *See Michigan Committee Statement Summary Page*, MICH. SECRETARY OF STATE (last visited April 16, 2024), available at https://cfrsearch.nictusa.com/documents/558536/details/filing/summary?changes=0.

freely about the issue," but they "cannot use House resources (e.g., staff, computers, etc.) to assist in those remarks . . . *The key issue is the use of House resources*."  (House Office Procedures at 3, **Ex. 2** (emphasis added).)  As "stewards of taxpayer funds," there is just "a heightened duty to safeguard public resources from misuse."  (*Id.* at 7.)

Recognizing this, Plaintiff has continued to speak freely on topics and in a manner that would violate the Printing Rules.  But because this speech was not funded with taxpayer resources, Plaintiff has been able to do so without consequence or restraint.  For instance, although the House Printing Guidelines restrict "comments critical of the institution of the legislature, legislators, or other individuals," Plaintiff has continued to make statements such as:



And although the Printing Guidelines restrict discussion of "[i]ssues related to a pending court case unless the issue is directly before the state legislature," Plaintiff has freely commented on judicial proceedings and other criminal matters initiated by Michigan's Attorney General:



IV.     **PLAINTIFF ATTEMPTS TO ENGAGE IN SPEECH THAT VIOLATES THE PRINTING RULES WHILE USING STATE RESOURCES.**

In contrast to the above communications, on February 14, 2024, Plaintiff *requested the use of state resources* to publish similar remarks.  (Compl. ¶ 41, PageID.7; Newsletter, ECF No. 1-2.)  Among other things, Plaintiff's proposed newsletter described "[a]n Imperial Governor whose character is thus marked by every act which may define a Tyrant"; labeled Democrats as "militant ideologues" who "will stop at nothing to advance their attacks on the Constitution and Bill of Rights"; claimed "Democrat Speaker Joe Tate . . . is leading the charge with fellow Democrats to push some of the most oppressive laws and policies possible"; and opined that "[t]he scale and scope of federal oppression of free speech as evidenced by the Missouri v. Biden case currently going before the Supreme Court, is breathtaking."  (Newsletter, ECF No. 1-2.)

The same day Plaintiff's office requested publication, Tabbatha Birmingham, an administrative assistant in the House Business Office, responded by explaining that the proposed newsletter "violates multiple portions of the printing guidelines and therefore is not approved." (ECF No. 1-3, PageID.21.)  She pointed to the Printing Guidelines' bar on "[c]omments critical of the institution of the legislature, legislators or other individuals" and comments that "[i]mpugn motives of legislators or other individuals, or accusations of intentional misrepresentation."  (*Id.*) And she attached a copy of the House Printing Guidelines for Plaintiff's review.  (*Id.*)  Despite the Printing Guidelines' clear language, Plaintiff claims he was "shocked and surprised" as "any American would be" when his request to use State resources to print the newsletter was denied. (Compl. ¶ 30, PageID.6.)

Nine days later, Plaintiff's office requested that Ms. Birmingham identify the "specific problems" so they can "fix those things" and "get it out or back to you so we can get it out quick."  (ECF No. 1-4, PageID.38.)  Again on that same day, Ms. Birmingham responded by

12

highlighting the specific language that violated the House Rules, citing to the specific House Rule that was violated, and correcting other inaccuracies.  (*Id.* at PageID.40-43.)

## V.   PLAINTIFF FILES THIS LAWSUIT.

Rather than try to "fix" the issues with the newsletter, Plaintiff filed this lawsuit on March 12th, claiming the Printing Rules are "scorchingly unconstitutional" and would "make Lady Liberty weep."  (Compl. at 2, PageID.2.)  He points to Legislative Council Rule 6, which "strictly prohibit[s]" the "use of legislative equipment for the printing of personal or partisan material of any nature," and identifies "examples" of prohibited material to include "negative comments about the institution of the legislature or a specific legislator."  (Compl. ¶ 14, PageID.4.)  He also points to House Printing Guideline Rules 3(g) and 3(h), which prohibit:

> (g). Comments critical of the institution of the legislature, legislators or other individuals.
>
> (h).  [Comments that i]mpugn motives of legislators or other individuals, or accusations of intentional misrepresentation.

(Compl. ¶ 17, PageID.4-5; House Printing Guidelines, ECF No. 1-3, PageID.26.)  Plaintiff claims these restrictions are "viewpoint-based" as they "prohibit negative and critical comments, but allow positive and laudatory comments about the legislature, legislators, and other individuals" and "prohibit asserting one is making an intentional representation, but allow one to assert someone is telling the truth."  (Compl. ¶ 21-22, PageID.5.)

Plaintiff also takes issue with House Printing Guideline Rule 3(af), which prohibits comments on "[i]ssues intending to influence pending court cases" and "[i]ssues related to a pending court case unless the issue is directly before the state legislatures."  (House Printing Guideline, ECF No. 1-3, PageID.28.)  Plaintiff claims this provision is "being applied in an unconstitutionally overbroad man[ner]."  (*Id.* ¶ 38 n.2, PageID.7.)  He further states that "[e]ven if the prohibition on speaking about court cases is upheld facially, it is unconstitutional as

13

applied" because it "restrained Plaintiff from discussing the unconstitutional actions taken by a sitting president."  (*Id.* ¶ 48, PageID.8.)  Plaintiff further asserts that the Printing Rules impose "a prior restraint on speech."  (Compl. ¶ 51, PageID.8.)

Plaintiff sued both the House and the House Business Office.  He also named Ms. Birmingham—who responded to the printing request—as a Defendant, along with Speaker of the House Joe Tate, Director of the House Business Office Douglas Simon, Deputy Director of the House Business Office Lisa Curtis, and the Speaker's Press Secretary, Amber McCann (together, the "Individual Defendants").  (Compl. ¶¶ 2-7, PageID.2-3.)  Plaintiff claims he has suffered "nominal damages," "emotional distress," "injury to reputation," and that he has incurred legal fees.  (*Id.* ¶ 44, PageID.7.)  And he seeks declaratory and injunctive relief, along with damages and attorneys' fees.  (*Id.* at PageID.10-11.)  Plaintiff also filed a motion for preliminary injunction, seeking to enjoin the enforcement of Legislative Council Rule 6 and House Printing Guideline Rules 3(g), 3(h), and 3(af).  (ECF No. 4.)  Alternatively, he requested that the enforcement of these rules be stayed pending appeal if injunctive relief is denied.

Because the merits of Plaintiff's claims are intertwined with his request for injunctive relief, the House Defendants submit this combined motion to dismiss and response to Plaintiff's motion for preliminary injunction.

## ARGUMENT

### I.   PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

#### A.   Legal Standards.

The House Defendants now move for dismissal under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  The House Defendants' sovereign immunity defense implicates this Court's subject-matter jurisdiction and is decided under Rule 12(b)(1).  *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1045 (6th Cir. 2015).  When a Rule 12(b)(1) motion attacks "the claim of jurisdiction on

14

its face"—like this one does—the standard mirrors that of Rule 12(b)(6).  *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).  Under Rule 12(b)(6), which also applies to the House Defendants' remaining arguments for dismissal, a complaint must state "sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Two "working principles" underlie the Rule's pleading requirements.  *Id.*  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id.*  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 679.

> **B.      Plaintiff's Claims Against the House of Representatives and House Business Office, and the Official Capacity Claims for Retrospective Damages Against the Individual Defendants, Are Barred by Sovereign Immunity.**

As a starting point, "[t]he states' sovereign immunity protects them from suit in federal court unless they consent, the federal Constitution specifically overrides that immunity, or Congress abrogates the states' immunity under a limited number of its enumerated powers." *Courser v. Mich. House of Representatives*, 831 F. App'x 161, 170 (6th Cir. 2020).  This immunity extends in full to claims against "arms of the state."  *Id.*  It also extends to claims for money damages brought against state officials in their official capacity.  *Id.*

Applying this black letter law, "all claims against the House of Representatives are barred by sovereign immunity because the House of Representatives is an arm of the State."  *Courser*, 831 F. App'x at 171.  The same logic applies to claims against the House Business Office, which is not an independent entity, but rather is an administrative unit within the House "responsible for the overall administration and financial operations of the House of Representatives and the House Fiscal Agency (HFA), working under the authority of the Speaker of the House."  *See Business Office*, MICH. HOUSE OF REPRESENTATIVES (last visited April 6, 2024), available at https://www.house.mi.gov/ContactUs/BusinessOffice.

Likewise, all official capacity claims against the Individual Defendants that seek monetary damages are also barred by sovereign immunity.  *Courser*, 831 F. App'x at 171.

And, while the House Defendants acknowledge that the *Ex parte Young* exception to sovereign immunity generally permits official capacity claims that seek prospective injunctive relief against state officials, that is only true when the state official "possesses some connection with the enforcement of the challenged law."  *Id.* (cleaned up) (citing *Ex parte Young*, 209 U.S. 123, 157 (1908)).  No named Defendant has unilateral enforcement authority over the Legislative Council Rules—indeed, only Speaker Tate is a member of the Council.  Each named Defendant is thus entitled to sovereign immunity as it relates to Plaintiff's request for an injunction of Legislative Council Printing Rule 6.  *Children's Healthcare is a Legal Duty v. Deters*, 92 F.3d 1412, 1415 (6th Cir. 1996) ("*Young* does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute.").

### C.    Plaintiff Has Failed to State a Claim Under the United States or Michigan Constitutions.

Moving past sovereign immunity, Plaintiff's claims under the United States and Michigan Constitutions fare no better on the merits.[8]

#### 1.    *The Printing Rules Are Not Subject to the First Amendment Because they Regulate Government Speech.*

While Plaintiff claims the Legislative Council Rules and House Printing Guidelines violate the First Amendment's restrictions on prior restraints and viewpoint discrimination, he skips over a threshold question: whether the First Amendment applies at all.  It does not.

---

[8] Plaintiff notes that the state claims "are coterminous to the rights afforded by the First Amendment of the United States Constitution."  (Pl.'s Br. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Br.") at 6 n.4, ECF No. 4, PageID.67.)  Thus, as Plaintiff does, the House Defendants generally refer to federal law to guide the analysis.

16

As the Supreme Court has repeatedly made clear, government speech is exempt from First Amendment scrutiny. *See, e.g.*, *Pleasant Grove*, 555 U.S. at 467 ("The Free Speech Clause restricts government regulation *of private speech*; it does not regulate government speech.") (emphasis added); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."); *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022) (explaining that the "first and basic question we must answer is whether" speech "constitutes government speech" because, if so, the speech can be regulated "based on viewpoint").

Although the "boundary between government speech and private expression can blur" at times, *Shurtleff*, 142 S. Ct. at 1589, it is clear as day here. When determining what qualifies as "government speech" courts "conduct a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." *Id.* at 1589. The Supreme Court has often "looked to several types of evidence to guide the analysis, including: the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 1589-90; *Small Bus. in Transp. Coal. v. Bowser*, 2023 U.S. App. LEXIS 8047, at *6 (D.C. Cir. Apr. 4, 2023) (noting these "[t]hree criteria generally guide the determination of whether speech is attributable to the government"). Each of these criteria support a finding of government speech.

**History**: Starting with history, "[c]ourts have recognized that '[a] medium that has long communicated government messages is more likely to be government speech.'" *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 247 (D.D.C. 2017) (quoting *Mech v. School Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1075-76 (11th Cir. 2015)). It is hard to imagine a medium more deeply

associated with government speech than official government correspondence sent using official government resources pertaining to official legislative business.  As detailed above, since the founding, the franking privilege has "played an important role in national politics" and allowed Members to "mail[] copies of acts, bills, government reports, and speeches, *serving as a distributor for government information*[.]" *Franking Privilege*, at 2 (emphasis added).  Its "clear purpose then, as it is today," is to "facilitate the carrying on of official [government] business." *Bolger*, 574 F. Supp. at 674.  And that clear purpose is expressly reflected in the Printing Rules, which go to great efforts to ensure that communications sent using House resources and subsidized by taxpayers are restricted to matters of "official legislative business."

    ***Perception***: Moving to perception, the question is whether "the public would reasonably interpret the government" or a private actor "to be speaking" through the communication. *Pulphus*, 249 F. Supp. 3d at 249.  When government officials speak in their official capacity, that speech is attributable to the government.  *Shurtleff*, 142 S. Ct. at 1595 (Alito, J., concurring) (explaining that the "government speaks in its own voice" when "an official gives a speech in a representative capacity").  This extends to members of the legislature.

    Take, for instance, *Pulphus*.  There, a member of Congress selected a piece of artwork for display in the Capitol as part of the Congressional Art Competition. 249 F. Supp. 3d at 240.  The art was later removed after other members of Congress "concluded that the painting was 'anti-police'" and failed "to meet the competition's suitability requirements," and the Congressman challenged the "suitability requirements" as improper viewpoint discrimination.  *Id.*  When assessing whether the public would perceive the art as government or private speech, the court noted that the competition was conducted "under the aegis of Congress," was "run by members of the House," and the art was displayed on government property with the "sponsoring House

18

member's name." *Id.* at 249-50.  The Congressmen selecting the art were engaging "not [in] private activity, but rather activity carried out in a member's official capacity." *Id.* at 252. And while it may seem "odd[]" that the Congressman "is both a plaintiff and a part of the 'government' that is speaking," that is how representative democracy works; "it is the government, first through [the Congressman] in his official capacity and then" through a committee of Congressmen overseeing the competition, that "decides in its discretion" what message can be communicated.  *Id.* (emphasis in original); *see also, e.g.*, *Fields v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 159 (3d Cir. 2019) (finding legislative prayer to be government speech after explaining that the "prayer is 'what a chosen agent of the government says as part of the government's own operations.'  At bottom, the government is the speaker.").

The same is true here.  The Printing Rules govern official correspondence from legislators that (1) is made in their official representative capacities, (2) concerns matters of "official legislative business," (3) is paid for with government funds and prepared using government resources, and (4) is either distributed through official government email accounts linked to the House, or through hard-copy mailings that include a notice indicating it was "Prepared by the Michigan Legislature."  This is reasonably perceived as government, as opposed to private, speech.[9]  Indeed, if license plates bearing a state's name (but with a message selected by the vehicle owner), *Walker*, 576 U.S. at 212, or monuments located on government property (but donated by third parties), *Summum*, 555 U.S. 471, are "closely identified in the

---

[9] The only reason Plaintiff is permitted to use House resources in the first place is because he is acting in his capacity as a state representative.  *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 127 (2011) ("[A] legislator has no right to use official powers for expressive purposes").  The fact that Plaintiff is attempting to use these resources for other purposes does not change the analysis.  If Plaintiff is acting in his official capacity to communicate matters of official government business, then he is engaging in government speech.  And if he is not, then—just like any other ordinary citizen—he has no right "to use governmental mechanics to convey a message" and no standing to challenge the policies, regardless.  *Id.*

public mind with the State, *id.* at 472, communications sent from the government itself readily meet this standard.

   **Control**: Finishing with control, "the key question is whether the government still 'effectively control[s]' the message being conveyed, . . . for example by maintaining 'final approval authority' over the selection" of the content. *Pulphus*, 249 F. Supp. 3d at 250 (quoting *Summum*, 555 U.S. at 473). Here, the House has authority to limit the use of state resources to official legislative business. "The text for printing requests for members of the House shall be reviewed under procedures authorized by the Speaker of the House[.]" (Legislative Council Rules at 31-32.) And "all newsletters . . . whether printed or electronic, must be reviewed by the House Business Office and the Speaker's office prior to the information being released to the public." (House Printing Guidelines, PageID.25.) This entire case stems from the fact that the House exercised that control here. "This is not a case in which the government has surrendered control . . . to a private party, or has failed to ever exercise its authority." *Pulphus*, 249 F. Supp. 3d at 253. Just the opposite, the House maintains and consistently exercises its control when it comes to ensuring House resources are used for House business.

*   *   *

   When determining whether speech qualifies as "government speech," the overarching question is "whether the government intends to speak for itself or to regulate private expression." *Shurtleff*, 142 S. Ct. at 1589. Here, the Printing Rules do not allow for—much less regulate—"private expression." They are implicated only when a Representative acts in their official capacity and requests the use of government resources to send communications from the government itself. And in that instance, communications are reasonably limited to matters of "official legislative business." This is government speech at its core. And the House—

20

consistent with centuries of practice—is free to restrict this speech as it sees fit without triggering the First Amendment.[10]  That is dispositive of this case.

          2.    ***The Legislative Council Rules and House Printing Guidelines Satisfy Constitutional Scrutiny.***

Even if the Printing Rules regulated private expression, rather than government speech, Plaintiff's claims would still fail because the Rules are constitutional.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend I.  The House Defendants have not done so.  Plaintiff has always been free to engage in whatever protected speech he likes.  *Urban Justice Ctr.*, 66 A.D.3d at 570 ("[T]he challenged rules do not prevent members of the Legislature from using self-financed mailings operating their own Web sites to express opinions on any subjects they wish.").  There are just internal policies in place that limit when Plaintiff can use taxpayer resources to fund that speech.  As the House Office Procedures make clear, Representatives "may speak freely about [an] issue," but for matters that do not qualify as "official legislative business," they just "cannot use House Resources . . . to assist in those remarks . . . The key issue is the use of House resources."  (House Office Procedures at 3, **Ex. 2**.)

That's an important distinction.  The Supreme Court has "held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right[.]"  *Regan*, 461 U.S. at 549 (collecting cases); *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) ("While in some contexts the government must accommodate expression, it is not required to assist others in funding the expression of particular ideas, including political

---

[10] The House Defendants note that this "does not mean that there are no restraints on government speech.  For example, government speech must comport with the Establishment Clause." *Summum*, 555 U.S. at 468.  "And of course, a government entity is ultimately 'accountable to the electorate and the political process[.]'" *Id.* (citation omitted).

ones.").  For that reason, "the government 'can make content-based distinctions when it subsidizes speech.'"  *Am Ass'n of Political Consultants v. United States SBA*, 810 F. App'x 8, 10 (D.C. Cir. 2020) (quoting *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 188-89 (2007)); *Urban Justice Ctr.*, 66 A.D.3d at 569 ("The government may make content-based restrictions on speech when the speech is subsidized for the very reason that the government may eliminate the entire category of government-subsidized speech, i.e., it can choose to subsidize some speech and not other speech.") (citing *Davenport*, 555 U.S. at 188-89; *Regan*, 461 U.S. at 548-550).

When the government's decision whether to subsidize private speech is at issue, rational basis review generally applies.  *Am. Ass'n of Political Consultants*, 810 F. App'x at 10; *see also Regan*, 461 U.S. at 547-48; *Ysursa*, 555 U.S. at 359.  And while the House Defendants acknowledge that viewpoint discrimination is still generally reviewed for strict scrutiny in the government subsidy context, *Interpipe Contr. v. Becerra*, 898 F.3d 879, 897 (9th Cir. 2018),[11] "[c]ontent-based funding decisions that are viewpoint neutral and reasonable" are consistently "upheld."  *Am. Ass'n of Political Consultants*, 810 F. App'x at 10 (collecting cases).

### a.  The Printing Rules Include Content-Based Criteria that Satisfy Rational Basis Review.

Plaintiff's First Amendment claims hinge on his contention that "Defendants' rules constitute unconstitutional viewpoint discrimination" rather than permissible content-based restrictions.  (Pl.'s Br. at 8, PageID.68.)

"Content discrimination" exists when the government regulates "particular speech because of the topic discussed or the idea or message expressed."  *Reed v. Town of Gilbert*, 576

---

[11] As set forth above, the House Defendants maintain that government speech is at issue and, when that is the case, even viewpoint-based restrictions (which the Printing Rules are not) would be permitted.  *Shurtleff*, 142 S. Ct. at 1589.  If the Court agrees that this is government speech, it need not reach the remaining issues.

U.S. 155, 163 (2015).  This "commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."  *Id.*  "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose."  *Id.*  "Viewpoint discrimination," on the other hand, is "an egregious form of content discrimination" in which "the government targets not subject matter, but particular views taken by speakers on a subject."  *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828-29 (1995).

Here, the Printing Rules center on an overarching content-based criterion: "[t]he use of House computers (including email and the network), printing and mailing equipment *for any use other than official legislative business is prohibited*."  (House Printing Guidelines, ECF No. 1-3, PageID.26; Legislative Council Rules at 31 ("The Legislative Service Bureau's printing and mailing equipment shall be used *for official legislative business only*.") (emphasis added).)  "The purpose of the guidelines is to provide subsidized communication between legislators and their constituents *with regard to the official business of the legislature*."  *Urban Justice Ctr.*, 66 A.D.3d at 570 (emphasis added).  Consistent with this, the Printing Rules include examples to guide legislators as to what is considered official legislative business, and what is not.

As relevant, the Printing Rules include "[c]omments critical of the legislature, legislators or other individuals," comments that "[i]mpugn motives of legislators or other individuals, or accusations of intentional misrepresentation," and "[i]ssues intending to influence pending court cases" or otherwise "related to a pending court case unless the issue is directly before the state legislature" as examples of speech that does not qualify as official legislative business.

23

But just because these restrictions include negative and critical comments as "examples" of speech that is not official legislative business does not mean they are viewpoint based.  Nor, contrary to Plaintiff's assertions, does the exclusion of these topics mean all "positive comments" or comments "agreeing with motivations" of legislators are permitted.[12]  Rather, the scope of permissible subject matter all comes down to a single content-based question: does the communication pertain to "official government business"?[13]  As recognized in *Urban Justice Center*, the guidelines serve the purpose of "provid[ing] subsidized communication between legislators and their constituents with regard to the official business of the Legislature."  66 A.D.3d at 569-70.  And "where the guidelines serve this purpose by prohibiting the use of certain content that might serve to disparage the Legislature as a whole or individual members, and most importantly, where the guidelines do not discriminate based on viewpoint but rather apply evenhandedly to all members of the Legislature regardless of party affiliation, the rational basis test is easily met."  66 A.D.3d at 569-70.  That is the case here.  The Printing Rules serve an

---

[12] For example, the House Printing Guidelines also prohibit "[s]olicitations of political support for a legislator or any person or political party."  (ECF No. 1-3, PageID.26.)  Along those same lines, Congress prohibits franked mail that includes "text laudatory and complimentary of any Member of, or Member-elect to, Congress on a purely personal or political basis rather than on the basis of performance of official duties."  39 U.S.C. § 3210(a)(5)(A).  Regardless of whether the communication is "positive" or "agree[s] with motivations" of legislators, it must still pertain to "official legislative business."

[13] That distinguishes this case from *Matal v. Tam*, 582 U.S. 218 (2017), where the Court addressed the Lanham Act's prohibition on the "registration of trademarks that may 'disparage or bring into contempt or disrepute any persons, living or dead.'"  *Id.* at 223 (citing 15 U.S.C. § 1052(a)) (cleaned up).  There, the overarching determination of whether a mark can be registered came down to a viewpoint distinction: is it disparaging, or not?  *Id.* at 243.  But here, the overarching determination comes down to a content distinction: is it official legislative business, or not?  Just because disparaging remarks untethered to any matter pending before the legislature such as Plaintiff's are not "official legislative business" does not mean the Printing Rules are viewpoint based.

important purpose of ensuring that taxpayer resources are used for official government business. And the content of those Rules is rationally related to that purpose.[14]  They should be upheld.

### b.        The Printing Rules Do Not Impose a Prior Restraint.

Likewise, Plaintiff's assertion that the Printing Rules impose an unlawful prior restraint is misplaced.  "The term prior restraint is used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur."  *Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 291-92 (5th Cir. 2015) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)) (emphasis in *Machete*). "[A] prior restraint must raise a 'legal impediment' to speech."  *Novak v. City of Parma*, 932 F.3d 421, 433 (6th Cir. 2019).  "'[T]he classic examples of prior restraints'" are "temporary restraining orders, permanent injunctions, and court orders" that outright prohibit speech.  *Id.* (quoting *Alexander*, 509 U.S. at 550-51).

Nothing of the sort has occurred here.  The House has not prohibited Plaintiff from engaging in any speech.  It has "merely opted not to subsidize the [speech] with [Michigan] taxpayer funds."  *Machete Prods.*, 809 F.3d at 292.  The refusal to distribute speech with government resources—as opposed to a law that outright prohibits speech—is not a prior restraint.  *See id.*; *see also, e.g.*, *Déjà Vu - San Francisco, LLC v. United States SBA*, 2020 U.S. Dist. LEXIS 199308, at *34-36 (N.D. Cal. Sept. 11, 2020) (no prior restraint when the law "does not restrict or prohibit speech and instead permissibly does not subsidize it").

---

[14] Plaintiff does not attempt to argue that House Printing Guideline (3)(af), related to discussion of court cases, is viewpoint based.  This plainly content-based restriction—which serves the same goal of ensuring that speech using government resources relates to official government business— would thus be permissible even if the Court disagreed as to the remaining rules raised by Plaintiff.

        **c.**       **This Court Should Decline to Serve as the Arbiter of What Does and Does Not Qualify as Official Legislative Business.**

As a final matter, Plaintiff does not appear to dispute whether the House is prohibited from limiting the use of state resources to matters of official legislative business in a general sense.  (Compl. at 2, PageID.2 ("Some of their requirements are reasonable. For example, the rules prohibit using printing rights for personal use or for purposes that do not relate to the work of the legislature.").)  To the extent he takes issue with the legislature's case-by-case determinations of what is and is not considered official legislative business, this Court—as Michigan's state courts and others have done—should decline to wade in.  *See, e.g.*, *Malisjewski v. Geerlings*, 226 N.W2d 534, 535-36 (Mich. Ct. App. 1974) (explaining that "the legislative council has adopted guidelines for processing printing requests by the legislative service bureau" and the court will not "substitute its judgment for the judgment of the legislative agency" as to whether a specific request was permissible); *Urban Justice Ctr.*, 66 A.D.3d at 568-69 (finding request for a "declaration that the subject rules and practices are invalid and an order restraining their future application" to be "beyond judicial review" as it is "left to the discretion of the respective chambers of the Legislature to define what constitutes 'official mail.'").

As noted in *Bolger*, "the distinction between 'official and 'unofficial'" legislative business "cannot be sharply defined or delineated and for the court to assume this burden would be an impossible task."  574 F. Supp. at 685.  "And to grant the relief which plaintiffs seek would in effect require us to issue rules of behavior superseding those that Congress, a coordinate branch of government, has responsibly set for itself."  *Id.*  "It is not this Court's function to examine the policing efforts of committees created by [a state legislature] to deal with the particular types of concerns raised by plaintiffs in this case with an eye to compel even

more refined standards and closer examination."[15]  The House has authority to set House policies, and this Court should decline to disturb those policies.

### D.     The Individual Capacity Claims Are Barred by Qualified Immunity.

For all of the reasons explained above, Plaintiff's First Amendment claim fails on the merits.  But even if this Court were to find otherwise, the claims against the Individual Defendants in their individual capacities would still be barred by qualified immunity.

Courts apply a two-prong test to determine whether a state official is entitled to qualified immunity, examining: "(1) whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such that 'a reasonable official would understand that what he is doing violates that right.'"  *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)).  A right is "clearly established" for purposes of this analysis when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations omitted).  There does not have to be a Supreme Court case "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

A finding that internal state legislative procedures regulating government speech violated the First Amendment would appear to break new ground.  Plaintiff's preliminary injunction briefing points to no case that has found as much.  Nor have the House Defendants located one.

---

[15]The House Rules require members to avoid personalities in floor debate, meaning Plaintiff could not engage in this rhetoric when speaking on the House floor.   House Rules at 28-29, available at https://www.legislature.mi.gov/Documents/Publications/rules/house_rules.pdf. Notably, this Court could not "supersede" those restrictions.  *Gravel v. United States*, 408 U.S. 606, 625 (1972).  Effectively, then, Plaintiff is asking this Court to require the House to subsidize speech that he could not engage in on the House floor itself.

Just the opposite, the only precedent the House Defendants have located on the issue has held that identical regulations are constitutional. *Urban Justice Ctr.*, 66 A.D.3d at 570.  Because any First Amendment right in this context is not "clearly established," qualified immunity shields the Individual Defendants from any liability for the individual capacity claims.

       **E.**       **Plaintiff Has Failed to Plead Sufficient Facts Tying Defendant McCann to the Claims Alleged in the Complaint.**

Last, the Complaint's sole mention of Defendant McCann is as follows: "At all relevant times herein, Defendants Simon and Curtis, under the supervision of Defendant Tate, who acts by and through his Press Secretary, Defendant McCann, as well as through Defendant Birmingham, enforced and implemented the Printing Rules and Guidelines."  (Compl. ¶ 16, PageID.4.)  While the House Defendants dispute whether numerous Defendants are properly named here, Defendant McCann's position as the Speaker's Press Secretary does not render her vicariously liable, and the exhibits attached to Plaintiff's Complaint show that she had no involvement in this specific printing request.  (ECF Nos. 1-3, 1-4 (showing direct communications with Ms. Birmingham).)  She should therefore be dismissed at the outset.

**II.**      **Plaintiff's Motion for Preliminary Injunction Should be Denied.**

       **A.**       **Legal Standards.**

"A preliminary injunction is an extraordinary and drastic remedy." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (citation omitted). "The purpose of" this drastic remedy "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

Plaintiff bears the burden to make a "clear showing" that he is entitled to this relief. *Acrisure, LLC v. Edgewood Partners Ins. Ctr.*, 2019 U.S. Dist. LEXIS 244770, at *6 (W.D. Mich. Mar. 11, 2019) (Jonker, C.J.) (cleaned up).  And when determining whether this high

burden has been met, courts balance four factors: (1) "whether the movant has shown a strong likelihood of success on the merits," (2) "whether the movant will suffer irreparable harm if the injunction is not issued," (3) "whether the issuance of the injunction would cause substantial harm to others," and (4) "whether the public interest would be served by issuing" an injunction. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

**B.   Plaintiff Is Not Likely to Succeed on the Merits.**

As to the first preliminary injunction factor, for all of the reasons explained above, Plaintiff is not likely to succeed on the merits of his claims; indeed, those claims should be dismissed with prejudice.  But even if this Court had questions as to whether the House Defendants are entitled to dismissal at this stage, at the very least, Plaintiff has not met *his burden* of making a *clear showing* that the speech at issue is not government speech, or that he can Defendants' other arguments.  Plaintiff's request for injunctive relief should be denied for that reason alone.  *S. Glazer's*, 860 F.3d at 849 ("A preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.") (citation omitted).

**C.   Plaintiff Will Not Suffer Irreparable Harm Absent Injunctive Relief.**

Apart from the likelihood of success factor, injunctive relief would still not be warranted because Plaintiff has not identified true "irreparable harm."  *See Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) ("Although the four factors must be balanced, the demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction.").

Plaintiff's argument in support of irreparable harm overlaps with his argument on the merits.  He claims his First Amendment rights have been violated and, consequently, that "he necessarily also establishes irreparable harm."  (Pl.'s Br. at 11, PageID.71.)  But the inverse is also true: if, as the House Defendants assert, Plaintiff is unlikely to succeed on the merits, then

given the lack of any other harm identified by Plaintiff, he also cannot meet the irreparable harm requirement. *Cf. Norris v. Stanley*, 567 F. Supp. 3d 818, 821 (W.D. Mich. 2021).

Moreover, the House Defendants do not dispute that in most instances, the deprivation of constitutional rights will amount to irreparable harm. This is not one of them. Again, the Printing Rules are not prohibiting Plaintiff from engaging in speech. They just limit what speech can be distributed through official House resources and subsidized with taxpayer funds. *Urban Justice Ctr.*, 66 A.D.3d at 569-70 ("[T]he challenged rules do not prevent members of the Legislature from using self-financed mailings or operating their own Web sites to express opinions on any subjects they wish, as both individual plaintiffs do."). Plaintiff is free to self-fund any speech that he so chooses. And any expenses incurred when doing so—to the extent they do not exceed the amount of printing funds allotted to each legislator—"can be readily remedied with money damages" and are therefore not "irreparable." *Acrisure*, 2019 U.S. Dist. LEXIS 244770, at *7-8; *Brooks v. Roberts*, 251 F. Supp. 3d 401, 432-33 (N.D.N.Y. 2017) ("Caselaw largely supports the finding of irreparable injury per se when a constitutional deprivation is alleged only where the protected right has been personal *and the violation non-compensable*.") (emphasis added).

### D.     Defendants Will Be Harmed if Injunctive Relief is Granted.

As to the balancing of harms, Plaintiff once more relies solely on his argument that he is likely to prevail on the merits. (Pl.'s Br. at 10-11, PageID.70-71.) Once more, he is mistaken on that point. And once more, even if he weren't, this factor would still not support relief that would upend the status quo and have the drastic effect of a federal court's injunction of long-standing rules promulgated by a state constitutional body (the Legislative Council) and state legislature while the merits are being resolved. Enjoining these policies would have impacts beyond the House having to endorse Plaintiff's speech as "official legislative business" or permit

the use of House resources for this purpose.  It would intrude on the legislature's ability to set

administrative policies and govern the conduct of its members, and would "in effect require [the

Court] to issue rules of behavior superseding those that [the House], a coordinate branch of

government, has responsibly set for itself."  *Bolger*, 574 F. Supp. at 685.

### E.      The Public Will be Harmed if Injunctive Relief is Granted.

Last, Plaintiff states that the public interest favors an injunction because it "is always in

the public interest to prevent the violation of a party's constitutional rights," and "to be able to

hear honest, uncensored, and balanced information from one's elected officials."  (Pl.'s Br. at 11,

PageID.71.)  Setting aside whether the information proposed in Plaintiff's newsletter is "honest"

and "balanced," Plaintiff can still provide the public with his "uncensored" thoughts so long as

he does not use state resources set aside for official legislative business to do so.  While the

public may have an interest in receiving information concerning matters of official legislative

business, the public at large has no interest in funding political rants.  *Bolger*, 574 F. Supp. at

683 ("mailings which are on their face political or private and therefore 'unofficial' in nature"

have long gone unfunded).  Those who wish to support this speech remain free to fund it

themselves, or to seek it out on the platforms that Plaintiff continues to use to engage in partisan

rhetoric.

### III.     Plaintiff's Request for a Stay Pending Appeal Should be Denied.

Finally, Plaintiff spends a paragraph arguing that if his motion for preliminary injunction

is denied, the Printing Guidelines should still be enjoined pending appeal to "preserve the status

quo."  (Pl.'s Br. at 11, PageID.71.)  He also states that "[n]o bond should be required" if an

injunction pending appeal is entered.

This request should be denied for three reasons.  First, to determine whether to stay a case

pending appeal, courts "consider the same four factors that are traditionally considered in

31

evaluating the granting of a preliminary injunction." *Mich. Coal. of Radioactive Material Users,*

*Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991).  If this Court finds that these factors

weigh against issuing an injunction, it is unclear what basis there would be to find that these

factors support a stay.  Second, while Plaintiff states that enjoining the Legislative Council Rules

and House Printing Guidelines pending appeal would "preserve the status quo," it would do the

opposite, effectively rescinding rules that have been in place for decades while an appeal is

decided.  Thus, if anything, the ruling should be stayed pending appeal if an injunction is

granted.  And third, while it is unclear what bond would be at issue if the House Defendants

prevail, to the extent a bond were at issue, Plaintiff has made no attempt to establish the

"extraordinary circumstances" courts within this Circuit require to waive it.  *Gerber v.*

*Herskovitz*, No. 19-13726, 2022 U.S. Dist. LEXIS 67439, at *5 (E.D. Mich. Apr. 11, 2022).

<u>CONCLUSION</u>

This Court should deny Plaintiff's motion for preliminary injunction, dismiss the

Complaint with prejudice, and enter judgment in Defendants' favor.


Respectfully submitted,

Dated:  April 17, 2024

*/s/ Kyle M. Asher*
Kyle M. Asher (P80359)
Steven C. Liedel (P58852)
DYKEMA GOSSETT PLLC
201 Townsend St., Suite 900
Lansing, MI 48933
(517) 374-9151
kasher@dykema.com

*Attorneys for the House Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 17, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the electronic filing system, which will send notification of such filing to all counsel of record at their respective addresses as disclosed on the pleadings.

Dated: April 17, 2024

By: *<u>/s/ Kyle M. Asher</u>*

125626.000001  4863-2318-3282.5