UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATT MADDOCK,

Plaintiff,

v.

CASE No. 1:24-cv-257

HON. ROBERT J. JONKER

MICHIGAN HOUSE OF REPRESENTATIVES, et al.,

Defendants.

______________________________/

# OPINION AND ORDER

## INTRODUCTION

Plaintiff Matt Maddock is an elected member of Michigan's House of Representatives. He regularly communicates with his constituents, including his criticisms of Michigan's Governor and her policies. Of course, he has every right to do so. The question in this case, though, is whether he has a right to do so on the taxpayer dime, rather than at his own expense. The defense says established rules say he does not. Plaintiff says the rules are unconstitutional. Because Plaintiff does not have a constitutionally protected right to taxpayer funding for his private speech, and because sovereign immunity bars some of Plaintiff's claims anyway, the Court grants the defense motion to dismiss.

## BACKGROUND

This case hinges on Michigan's messaging privilege, a state variant of the historic federal franking privilege. Both allow legislators to use taxpayer funds to communicate with their constituents on official government matters. The privilege has not historically provided

government funding for a legislator's private political or policy messages. The Court begins with a brief history of the congressional frank and then outlines the Michigan Legislative Council Printing Rules ("Printing Rules") and the Michigan House of Representatives Printing Guidelines ("Printing Guidelines") that form the basis for Maddock's Complaint.

**I. History of the Congressional Frank**

The franking privilege "has existed in the United States since colonial times." CONG. RSCH. SERV., FRANKING PRIVILEGE: HISTORICAL DEVELOPMENT AND OPTIONS FOR CHANGE 1 (2016). "The franking privilege . . . allows Members of Congress to transmit mail under their signature without postage. . . ." *Id.*

And since the colonial era, the purpose of the congressional frank has remained fixed: "to assist and expedite the conduct of the official business, activities, and duties of the Congress of the United States." Jeffrey R. Bellomo, *Hamilton v. Hennessey: A Check on Misuse of Representative Franking Privileges During Campaigns*, 12 Widener L.J. 310 (2003) (quoting 39 U.S.C. § 3210(a)(1) (2000)) (current version at 39 U.S.C. § 3210(a)(2)). United States Senator Samuel Phelps stated: "It is a privilege not for the benefit of the member of Congress, but for the information and sati[s]faction of the people. They have a right to know what is doing in Congress, and by means of this privilege they are put in possession of that knowledge." Roman J. Hoyos, *The People's Privilege: The Franking Privilege, Constituent Correspondence, and Political Representation in Mid-Nineteenth Century America*, 31 LAW & HIST. REV. 109, 111 (2013). Congress reformed the privilege in 1973 but retained its primary purpose: to carry out "official [governmental] business." Bellomo, *supra*, at 310 (quoting 39 U.S.C. § 3210(a)(1) (2000)) (current version at 39 U.S.C. § 3210(a)(2)). Congress has maintained that purpose by defining "official business" as "all matters which directly or indirectly pertain to the legislative process or to any congressional representative functions generally, or to the functioning,

working, or operating of the Congress and the performance of official duties in connection therewith." 39 U.S.C. § 3210(a)(2). Congress also provides examples of uses that are prohibited. The statute expressly prohibits mailing materials that are "laudatory and complimentary" of a member of Congress. 39 U.S.C. § 3210(a)(5)(A). Thus, even through years of reform, the privilege's purpose never wavered in limiting use of taxpayer funding to matters of official government business, not private expressions of a legislator's views.

**II. Michigan's Messaging Privilege and its Guidelines and Rules**

Like the congressional frank, the Michigan messaging privilege enables Michigan legislators to publish official communications for their constituents at the public's expense. (ECF No. 1 ("Compl."), PageID.2.) Their publications, like their federal counterparts, must meet specific requirements. (*See id.*). Under Michigan's messaging privilege, publications at the public's expense must pass scrutiny under the Printing Rules and Printing Guidelines. (*Id.*).

**A. The Printing Rules**

When legislators seek to publish their communications under Michigan's messaging privilege, the publishing may be completed using only the Legislative Service Bureau's printing and mailing equipment. (*Id.* ¶¶ 13–14 (quoting Legislative Council Printing Rule 6, ECF No. 1-1); Legislative Council Rules, ECF No. 12-1, PageID.189–90). The Michigan Legislative Council, a bipartisan, bicameral, and constitutionally created body of legislators, is tasked with implementing the guidelines concerning the use of the Legislative Service Bureau's printing and mailing equipment. (*Id.* ¶¶12–13, 19). For example, Rule 6 provides that publication of personal or partisan communications is strictly prohibited:

> The Legislative Service Bureau's printing and mailing equipment shall be used for official legislative business only. Official legislative business is deemed to include all issues of statewide interest or of general interest to an entire legislative district. The use of legislative equipment for the printing of personal or partisan material of any nature for a legislator is strictly prohibited. . . . Some examples of specific

> references in legislative printings which are prohibited are requests to vote for or against someone or some concept, solicitations of money for any purpose, or negative comments about the institution of the legislature or a specific legislator.

(*Id.* ¶ 14). Furthermore, the Printing Rules require that the following notice be included on all newsletters: "Prepared by the Michigan Legislature." (Legislative Council Rules, PageID.189–90).

**B. The Printing Guidelines**

Legislators must also abide by the Printing Guidelines, which the Michigan House of Representatives ("Michigan HOR") manages. (Compl. at ¶ 15); Printing Guidelines, ECF No. 1-3, PageID.26). The Guidelines likewise prohibit partisan material:

> The House Duplicating Center's and Legislative Service Bureau's printing and mailing equipment shall be used for official legislative business only. Only printing the HDC's or LSB's equipment is capable of producing will be printed. Official legislative business is deemed to include all issues of statewide interest or of general interest to an entire legislative district. The use of legislative equipment for the printing of personal or partisan material of any nature for a legislator is strictly prohibited. Examples of prohibited printed or electronic material include, but are not limited to:
>
> g. Comments critical of the institution of the legislature, legislators or other individuals.
> h. Impugn motives of legislators or other individuals, or accusations of intentional misrepresentation.
> . . .
> af. Issues intending to influence pending court cases. Issues related to a pending court case unless the issue is directly before the state legislature

(Printing Guidelines, PageID.26).

In sum, the Printing Rules and the Printing Guidelines prohibit legislators from distributing newsletters that are partisan in nature on the taxpayer dime. Neither, however, prohibits legislators from speaking in partisan terms on their own dime. Thus, if legislators "wish to speak on matters unrelated to official legislative business, they are free to do so . . . the House just won't pay [to] prepare, pay for, or distribute the [publication] through official government channels." (Defs.' Br.

in Supp. of Mot. to Dismiss, ECF No. 12, PageID.125). The messaging privilege limits use of taxpayer funds to matters of official legislative business.

**III. The Defendants Declined to Publish Maddock's Newsletter**

In February 2024, Maddock sought to publish a newsletter that, in his words, "parallels [] the Declaration of Independence." (Compl. at ¶¶ 26, 41). He transmitted an initial draft to Defendant Tabbatha Birmingham, an Administrative Assistant in the House of Representatives Business Office. (*Id.* at ¶ 28). Maddock's draft described Michigan Governor Gretchen Whitmer as an "Imperial Governor whose character is thus marked by every act which may define a tyrant," and labeled Democrats as "militant ideologues" who "will stop at nothing to advance their attacks on the Constitution and Bill of Rights." (Maddock Newsletter, ECF No. 1-2, PageID.16–19). It further claimed, "Democrat Speaker Joe Tate . . . is leading the charge with fellow Democrats to push some of the most oppressive laws and policies possible." (*Id.*).

Ms. Birmingham did not publish this draft. (*See* Compl. at ¶¶ 31, 39). She told Maddock's team that the draft violates "multiple parts of the Printing Guidelines," (*id.* at ¶ 31), and that the newsletter's criticism of Governor Whitmer and Speaker Tate violates the Printing Rules (*id.* at ¶ 37). She also highlighted violations under Rules 3(g) and (h). (*Id.* at ¶ 38).

**IV. Maddock's Complaint**

Maddock filed this Complaint alleging free speech violations under the First Amendment of the United States Constitution and the Michigan Constitution. He claims that Printing Rule 6, which "strictly prohibit[s]" the "use of legislative equipment for the printing of personal or partisan material of any nature," and identifies "examples" of prohibited material to include "negative comments about the institution of the legislature or a specific legislator" violates the First Amendment's right to free speech. (*Id.* at ¶ 46). He also asserts that Printing Guidelines (3)(g), (h), and (af) violate the First Amendment. (*Id.* at ¶¶ 47–50). Maddock claims these restrictions

are prior restraints and viewpoint-based as they "prohibit negative and critical comments, but allow positive and laudatory comments." (*Id.* at ¶¶ 50–53).

Maddock sues multiple defendants and requests various forms of relief. He sues both the Michigan HOR and the Business Office. (*Id.* at ¶ 3). He also names Ms. Birmingham—who responded to the printing request—as a defendant, along with Speaker of the House Joe Tate, Director of the House Business Office Douglas Simon, Deputy Director of the House Business Office Lisa Curtis, and the Speaker's Press Secretary, Amber McCann, in their official and individual capacities. (*Id.* at ¶¶ 2, 4–7). As for relief, Maddock seeks nominal damages, damages related to "emotional distress," "injury to reputation," and legal fees. (*Id.* at ¶¶ 10–11). Moreover, he requests declaratory and injunctive relief enjoining the enforcement of Printing Rule 6 and Printing Guidelines 3(g), (h), and (af). (*Id.*).

## LEGAL STANDARDS

### I. Sovereign Immunity

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "They possess only that power authorized by the Constitution and statute." *Id.* (citations omitted). Sovereign immunity under the Eleventh Amendment impacts subject matter jurisdiction. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). With only limited exceptions, federal courts do not have jurisdiction to hear suits against state governments or state officials. *See id.* Here, the Defendants have sovereign immunity from suit unless that immunity has been expressly waived or abrogated or they are sued for prospective injunctive relief. *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *Ex Parte Young*, 209 U.S. 123 (1908). Maddock must show that the Defendants' immunity has been waived or abrogated or that the narrow *Ex Parte Young* exception applies to avoid dismissal for lack of subject-matter

jurisdiction. *Reetz v. United States*, 224 F.3d 794, 795 (6th Cir. 2000); *Cotton v. Mansour*, 863 F.2d 1241, 1246 (6th Cir. 1988).

Defendants' jurisdictional challenge is purely legal, so they raise a "facial attack" on the Court's jurisdiction. In evaluating such a challenge, this Court "takes the allegations in the complaint as true, which is a similar safeguard employed under [Rule] 12(b)(6) motions to dismiss." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

**II. Failure to State a Claim**

The purpose of a motion under Federal Rule of Civil Procedure 12(b)(6) is to assess whether the complaint is legally sufficient to allow the case to proceed further when all the allegations are taken as true. FED. R. CIV. P. 12(b)(6); *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citations omitted). Under Rule 12(b)(6), the complaint is viewed in the light most favorable to the plaintiff. *Luis v.* Zang, 833 F.3d 619, 625 (6th Cir. 2016) (citing *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)). The allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *Bassett*, 528 F.3d at 430. Generally, to survive a motion to dismiss, the complaint must state enough facts to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "However, while liberal, this standard of review does require more than bare assertions of legal conclusions." *Colson v. Wilmington Sav. Fund Soc'y*, No. 17-11387, 2018 WL 345174, at *9 (E.D. Mich. Jan. 10, 2018) (quoting *Columbia Nat'l Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)). "To survive a motion to dismiss, a plaintiff must plead enough factual matter that, when taken as true, state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007) (internal quotations omitted).

In deciding this motion, the Court may not consider matters extraneous to the pleadings. Typically, "matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss unless the motion is converted to one for summary judgment under Fed. R. Civ. P. 56." *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) (citing *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997)). Nonetheless, the Court may consider "public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (citations omitted).

## Analysis

### I. Sovereign Immunity

Generally, the Eleventh Amendment bars suits against states, state agencies, state departments, and state officials in their official capacity in federal court. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996); *Stanley v. W. Mich. Univ.*, 105 F.4th 856, 863 (6th Cir. 2024) (explaining that Eleventh Amendment sovereign immunity falls under Rule 12(b)(1)). The Eleventh Amendment, moreover, protects states against all types of claims, "whether for injunctive, declaratory or monetary relief." *Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 381 (6th Cir. 1993).

Three exceptions to Eleventh Amendment immunity exist. First, Congress may abrogate a state's immunity under its Fourteenth Amendment power. *See Alden v. Maine*, 527 U.S. 706, 756 (1999). Second, a state may waive its immunity. *See Sossamon v. Texas*, 563 U.S. 277, 284–85 (2011). Third, under *Ex Parte Young*, officials violating or threatening to violate the Constitution "may be enjoined by a Federal court of equity from such action." 209 U.S. 123, 155–

56 (1908). A plaintiff must meet two conditions to trigger the *Ex Parte Young* exception. For starters, the plaintiff's action must seek prospective relief that ends a continuing violation of federal law. *Carten v. Kent State Univ.*, 282 F.3d 391, 395 (6th Cir. 2002). Then, the plaintiff must show that the state officials have "some connection" to that ongoing violation. *Ex parte Young*, 209 U.S. at 157–59. The two-step inquiry focuses on the allegations only; it "does not include an analysis of the merits of the claim." *Verizon Md. Inc. v. PSC*, 535 U.S. 635, 646 (2002).

**A. Michigan HOR and Business Office**

Sovereign immunity blocks Maddock's claims against the Michigan HOR and the Business Office. In *Courser v. Mich. House of Representatives*, the Sixth Circuit held that claims "against the [Michigan] House of Representatives are barred by sovereign immunity because [it] is an arm of the State." 831 F. App'x 161, 170 (6th Cir. 2020) (citing MICH. CONST. ART. IV, § 1). And while no case speaks expressly on whether the Business Office is an arm of Michigan, the Court sees no material difference between the Business Office and other governmental offices protected by the Eleventh Amendment. *See Stevens v. Mich. State Ct. Admin. Off.*, No. 21-1727, 2022 WL 3500193, at *4-5 (6th Cir. 2022) (holding that Michigan State Court Administrative Office is entitled to sovereign immunity); *Johnson v. New Jersey*, 869 F. Supp. 289, 298 (D.N.J. 1994) (holding that the Administrative Office of the Courts is entitled to Eleventh Amendment immunity from a suit for money damages). Congress has not abrogated the Business Office or Michigan HOR's immunity nor have these entities waived their immunity. Accordingly, the Michigan HOR and Business Office enjoy sovereign immunity from Maddock's suit. The Court lacks jurisdiction over these entities.

**B. Individual Defendants in their Official Capacities**

Maddock's claims against the Individual Defendants in their official capacities are also barred by sovereign immunity unless one of the exceptions apply. *Kentucky v. Graham*,

473 U.S. 159, 165–66 (1985) (internal quotation marks omitted). Maddock relies on the third exception: *Ex Parte Young*. As noted above, Maddock must satisfy two elements to meet this exception. *See Doe v. DeWine*, 910 F.3d 842, 848 (6th Cir. 2018). His action must seek prospective relief, and the state officials sued must have "some connection" to the constitutional violation asserted. *Id.* The Individual Defendants concede that Maddock seeks prospective relief. (Defs.' Br. in Supp. of Mot. to Dismiss, PageID.131). They instead rest their argument on Maddock's failure to show that they have "some connection" to the First Amendment violations he asserts. (*Id.*)

To show that the official has some connection to the constitutional violation, "[a] plaintiff must allege facts showing how a state official is connected to, or has responsibility for, the alleged constitutional violations." *Top Flight Entm't, Ltd. v. Schuette*, 729 F.3d 623, 634 (6th Cir. 2013) (citation omitted). Many courts have interpreted "some connection" to track Article III's standing requirements—injury in fact, causation, and redressability. *See Saqr v. Univ. of Cincinnati*, No. 1:18-cv-542, 2020 WL 5361669, at *21-22 (S.D. Ohio Sep. 8, 2020); *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 864 (8th Cir. 2006) (referring to the *Ex Parte Young* and Article III requirements as "related" and noting that if an official has "'some connection with the enforcement' of a state law for purposes of the *Ex Parte Young* doctrine, then the case or controversy requirement of Article III was satisfied"); *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017) (citation omitted) (explaining that there is "significant overlap between Article III jurisdiction, *Ex Parte Young*, and equitable relief").

So to allege a plausible *Ex Parte Young* theory, Maddock must show (1) that the Individual Defendants played some role in *causing* the ongoing harm he claims and (2) that an injunction against that official will be likely to provide *redress*. Causation—stated ordinarily in terms of

responsibility—requires "[a] plaintiff [to] allege facts showing how a state official is connected to, or has responsibility for, the alleged constitutional violations." *Top Flight Entm't*, 729 F.3d at 634. Put differently, the official must have more than a general duty to see that laws are implemented; the official must have a "particular duty to enforce the statute in question." *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020)). And as for redressability, "[t]he official against whom suit is brought must have the authority to perform the act sought" by the prospective relief. *Ling v. Univ. of Tenn.*, No. 04-2484, 2005 WL 8156688, at *2 (W.D. Tenn. Jan. 4, 2005).

Of the five Individual Defendants, Maddock has alleged sufficient facts linking only one—Ms. Birmingham—to the First Amendment violations asserted. He alleges that she has responsibility and authority for enforcing the Guidelines and Rules by "respond[ing] that the newsletter violated multiple portions of the printing guidelines . . . and approval to print the newsletter was denied." (Compl. at ¶ 31). He also claims, "Birmingham did not deem the favorable invocation Jesus Christ, by name, to violate the Rules." (*Id.* at ¶ 40). Taken together, these allegations are enough to state a plausible *Ex Parte Young* theory against Ms. Birmingham.

Yet, for the other individuals, Maddock hardly mentions their responsibility or authority in enforcing the Printing Rules or Guidelines. The allegations he does make about them are conclusory and threadbare: "Defendants Simon and Curtis, under the supervision of Defendant Tate, who acts by and through his Press Secretary, Defendant McCann . . . enforced and implemented the Printing Rules and Printing Guidelines." (Compl. at ¶ 16); *see, e.g.*, *Miller v. Carroll*, No. 3:21-cv-14-VLB, 2021 WL 1964604, at *29-30 (D. Conn. May 17, 2021) (rejecting *Ex Parte Young* argument because the plaintiff asserted only conclusory allegations of some connection requirement). Moreover, merely implementing or enacting rules, statutes, or bills is

insufficient to meet the *Ex Parte Young* exception. *See, e.g.*, *Scott*, 28 F.4th at 672–74 (ruling that *Ex Parte Young* exception did not apply because official had only a general duty to see that state law complained of was implemented); *Wright v. North Carolina*, 787 F.3d 256, 262–63 (4th Cir. 2015) (holding that House Speaker and Senate President Pro Tem of North Carolina were not proper defendants in an *Ex Parte Young* action since neither had a duty to enforce the harm complained of); *cf. DeWine*, 910 F.3d at 848–49 (finding officials who promulgated sex-offender registration requirements, operated state-wide sex-offender database, and sent and structured community notifications that alerted citizens to proximity of registered offenders to have "some connection" to challenged law). Because Maddock's allegations speak only in a conclusory and general sense regarding Simon's, Curtis's, Tate's, and McCann's authority and enforcement of the Printing Rules and Guidelines, the Court finds that plaintiff has failed to allege a plausible *Ex Parte Young* theory against them.

**C. Individual Defendants in their Individual Capacities**

Maddock's individual capacity claims against the Individual Defendants are not barred by sovereign immunity. *Hafer v. Melo*, 502 U.S. 21, 25–27 (1991). But to state a claim against the Individual Defendants in their individual capacities, Maddock must make allegations sufficient to show that they were personally involved in the alleged wrongdoing. *Frazier v. Mich.*, 41 F. App'x 762, 764 (6th Cir. 2002) (providing that "a complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights' to state a claim upon which relief may be granted). And here, for the same reason he comes up short on the *Ex Parte Young* allegations against Simon, Curtis, Tate, and McCann, he has failed to state a claim against these four in their personal capacities.

In short, the only *Twombly*-plausible claims Maddock has stated that are not barred by sovereign immunity are those against Ms. Birmingham in her official and individual capacities.

## II. First Amendment Merits

Maddock contends that Ms. Birmingham violated the First Amendment's free speech clause by applying the Printing Rules and Guidelines against his newsletter. He alleges that the Defendants' restriction on his speech is "content-based," "viewpoint discriminatory," and "a prior restraint." (Compl. at ¶¶ 49, 51.) Defendants aver that Maddock's Complaint should be dismissed because the Printing Rules and Guidelines he challenges apply to unprotected government speech, and because they pass muster, in any event, as appropriate regulation of subsidized private speech. In sum, the defense says Maddock is free to publish a newsletter containing his personal views and criticisms at his own expense, but he is not free to use taxpayer resources to do so.

### A. Government Speech

The First Amendment protects citizens' free speech rights in part by shielding them from discriminatory government regulation. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995). That said, the First Amendment "does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (citations omitted). As a result, a government entity may "speak for itself" and "select the views that it wants to express." *Id.* at 467–68 (citations omitted); *Raven v. Sajet*, 334 F. Supp. 3d 22, 32 (D.D.C.) ("Even political discrimination is allowed when the government chooses to sponsor speech."). The government, for instance, "need not promote 'pro-littering' campaigns aside its anti-littering campaigns." *Penkoski v. Bowser*, 548 F. Supp. 3d 12, 21 (D.D.C. 2021) (citing *Nat'l Endow. for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view.")). Otherwise, "government would not work." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

The *Walker* Court developed three factors for courts to consider whether speech is private or government. *Walker*, 576 U.S. at 209–10. First, a court must determine whether the medium at issue has historically been used to communicate messages from the government. *Id.* Second, the court must assess whether the public reasonably interprets the government to be the speaker. *Id.* Third, the court must see whether the government maintains editorial control over the speech. *Id.* These factors, however, are simply a guide and are "neither individually nor jointly necessary for speech to constitute government speech." *Leake v. Drinkard*, 14 F.4th 1242, 1248 (11th Cir. 2021) (citing *Mech v. Sch. Bd. of Palm Beach Cnty., Fla.*, 806 F.3d 1070, 1075–76 (11th Cir. 2021)).

The D.C. District Court applied this analysis in *Raven v. Sajet*, 334 F. Supp. 3d 22 (D.D.C. 2018). There, the Smithsonian's National Portrait Gallery, a federal establishment, declined to display a portrait of then-President-elect Trump. *Id.* at 27. The Gallery's representative and the Smithsonian's provost rejected the artwork because it was "too big," "too political [and] not neutral enough," and "too pro-Trump." *Id.* at 26 (cleaned up). The artist sued the Gallery's representative and the Smithsonian's provost for violating the free speech clause. *Id.* at 27. The district court applied *Walker* at the motion to dismiss stage and found no violations: "First, the National Portrait Gallery has historically communicated messages from the government. . . . Second, the public would reasonably interpret the government to be the speaker . . . [because] the government's selection itself conveys a government message. . . . Third, the Smithsonian's Board of Regents and its subordinates maintain editorial control over the speech." *Id.* at 31–32. The court concluded that the First Amendment did not protect the speech. *Id.* at 32.

This Court applies the same analysis here to Michigan's messaging privilege.

**1. History**

The history factor directs this Court to ask whether the type of speech under scrutiny has traditionally "communicated messages" on behalf of the government. *Walker*, 576 U.S.

200 at 211. In *Summum*, the Court observed that "[g]overnments have long used monuments to speak to the public." *Summum*, 555 U.S. at 470. Monuments on public land, even privately funded ones, were no different for this factor. *See id.* at 470–71. The Court also noted that license plates have a long-established history of conveying messages from the states that issued them, through graphics, slogans, or text. *Walker*, 576 U.S. 200 at 214. The *Walker* Court observed that states began displaying graphics on license plates as early as 1917, with state slogans appearing on some plates since 1928. *Id.* at 211.

Here, the history factor weighs in favor of finding government speech. Since colonial times, the franking privilege's purpose was to facilitate communication of official government business to the public. CONG. RSCH. SERV., *supra*, at 1. For instance, in 1844, United States Senator William Allen explained in a debate that he "was in the habit of sending to the printers of newspapers in his State . . . all the important documents which he received for distribution," believing the printers would preserve those documents as a library for reference. Hoyos, *supra*, at 109 (quoting *Congressional Globe*, 28th Cong., 1st sess., (April 4, 1844), 470). Similarly, United States Senator Samuel Phelps provided, "[i]t is a privilege not for the benefit of the member of Congress, but for the information and sati[s]faction of the people." *Id.* at 111. He further explained, "[The people] have a right to know what [Congress is doing], and by means of this privilege they are put in possession of that knowledge." *Id.* And their conduct shows that their statements were not just lip service. They sent their constituents reports on the Pacific Railroad Surveys, and farmers reports on insects, insects that would either harm or grow their crops. *Id.* at 116–17, 120–21. The result was an "information revolution" that armed the American citizenry with civic knowledge. *Id.* at 114–15. Throughout its history, "official business" has remained the

privilege's North Star and the focus of amendments designed to protect against abuse for private or political gain. *See* CONG. RSCH. SERV., *supra*, at Summary.

So, "the privilege was conceived of simply as a tool to facilitate the business of government." Hoyos, *supra*, at 106. And that purpose is reflected in Michigan's franking privilege. The Printing Rules and Guidelines ensure that communications sent using House resources and subsidized by the public are restricted to matters of official governmental business.

**2. Endorsement**

The second of the factors, endorsement, asks whether "the kind of speech at issue is often closely identified in the public mind with the government." *Summum*, 555 U.S. at 472. For example, in *Walker*, the Court found that specialty license plates were closely associated with Texas government because the government required them, regulated them, and stamped "TEXAS" on them. *Walker*, 576 U.S. at 212. Likewise, the court in *Pulphus v. Ayers*, found that a selected piece of artwork for display in the Capitol as part of the Congressional Art Competition weighed in favor of the endorsement factor. *Pulphus*, 249 F. Supp. at 249. The *Pulphus* court landed in favor of this factor because the competition was conducted under the "aegis of Congress," "was [run] by Members of the House," and "was displayed on government property." *Id.* Similarly, the Eleventh Circuit found that speech disseminated over a public address system at a football game would generally be assumed to convey messages with which the game's organizers agreed. *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1233–35 (11th Cir. 2019).

The same logic which applies to monuments, license plates, art, and speech over a PA system applies here. The Printing Rules allow correspondence of only "matters of official legislative business." (Compl. at ¶ 14). The correspondence issued is also published and distributed electronically or physically at the public's expense. (Printing Guidelines, PageID.25).

What's even more telling—like requiring "TEXAS" to be stamped on license plates—the Printing Rules require that the following notice be included on all newsletters: "Prepared by the Michigan Legislature." (Legislative Council Rules, PageID.189–90). Just as the courts have assumed that sporting event organizers do not generally convey messages with which they disagree, this Court assumes that the Michigan HOR would not publish divisive partisan political speech attacking its own Speaker.

**3. Control**

Finally, the control factor asks whether the relevant government unit "maintains direct control over the messages conveyed" through the speech in question. *Walker*, 576 U.S. at 213. In *Summum*, the city had "rules governing the acceptance of artwork for permanent placement in city parks," requiring approval of the finished product or a model before any piece of art would be accepted. *Summum*, 555 U.S. at 472. Texas similarly reserved "final approval authority" over all license plate designs and would reject designs inconsistent with how the state chose "to present itself and its constituency." *Walker*, 576 U.S. at 213. Both courts found these facts to weigh in favor of finding government speech.

In this case, the control factor strongly weighs in favor of finding government speech. The Printing Rules and Guidelines show that the Michigan HOR, Business Office, and Legislative Service Bureau maintain final authority on what gets published at the public's expense. The Rules and Guidelines Maddock challenges cannot be clearer on this point: "The text of printing requests for members of the House shall be reviewed under procedures authorized by the Speaker of the House." (Legislative Council Printing Rule 6). "[A]ll newsletters . . . whether printed or electronic, must be reviewed by the House Business Office and the Speaker's office prior to the information being released to the public." (Printing Guidelines, PageID.25). As the Defendants

aptly state: "This entire case stems from the fact that the House exercised that control here." (Defs.' Br. in Supp. of Mot. to Dismiss, PageID.135).

* * *

There is no reasonable conclusion but that this is a government speech case. All factors support such a finding. The franking privilege, which Michigan's messaging privilege copies, dates to colonial times and has always carried the purpose of facilitating official governmental business. Likewise, reasonable observers would believe that the Michigan HOR endorses newsletters that comply with the Printing Guidelines and Printing Rules because the "Prepared by the Michigan Legislature" notice and the newsletter's substance relate to official governmental business. And the Michigan HOR and its Business Office control almost every facet of correspondence to be published through Michigan's messaging privilege. Because Maddock proposed to publish his newsletter at taxpayer expense, he was engaging in proposed government speech and subject to the rules historically applied to it. If he wished to publish his personal criticisms of other partisan players, he was free to do so at his own expense. There was no First Amendment violation.

**B. Maddock's Arguments to the Contrary are Unavailing.**

Maddock argues that this is not government speech because the Michigan Legislature "speaks as a whole *only when it passes legislation*, not when its individual members wish to speak to their constituents on issues that affect them or their own opinion on legislative issues." (Pl.'s Br. in Opp'n to Mot. to Dismiss, ECF No. 18, PageID.267 (emphasis in original)). He also cites *Matal v. Tam*, 582 U.S. 218 (2017), a government speech case that deals with trademarks, for support. (*Id.*) Neither argument is persuasive.

Maddock's first argument rests on the unstated and mistaken premise that the Printing Rules and Printing Guidelines restrict him from speaking at all. They do not. Nothing in the

Printing Rules and Printing Guidelines prevents Maddock, or any other legislator, from speaking their mind on partisan issues; the rules just prevent that kind of personal speech on the taxpayer dime. Maddock has demonstrated that over and over again because he regularly communicates his personal and partisan views on social media without any interference from the defense. (Defs.' Br. in Supp. of Mot. to Dismiss, PageID.126). The rules at issue here are all about limiting taxpayer funding to matters of official government business, and not forcing public financing of anyone's partisan positions.

The Court also rejects Maddock's reliance on *Tam*. In *Tam*, a rock group wished to trademark its name, which was a derogatory slur. 582 U.S. at 223. The government denied the trademark, relying on a statute that prohibited the government from issuing trademarks that may disparage persons, living or dead. *Id.* The lead singer brought a First Amendment claim against the United States Patent and Trademark Office's Interim Director for enforcing that statute. *Id.* The government argued that the free speech clause of the First Amendment does not apply because registered trademarks constitute government speech. *Id.* at 229. The Court rejected this argument, reasoning that if trademarks represent government speech, then all popular slogans like "Just do it" (Nike) or "Have it your way" (Burger King) would constitute government speech. *Id.* at 236. The Court also reasoned that the public generally does not know what trademark registration means. *Id.* at 237. And the Court distinguished the facts from *Summum* on the idea that "parks would be overrun if they were obligated to accept all monuments offered by private groups." *Id.* at 238. The Court at last explained that "[t]rademarks have not traditionally been used to convey a Government message." *Id.*

But a newsletter is entirely different from a trademark. As the *Tam* Court explained, the public does not associate a trademark with the government. *Id.* Whereas here, messages published

through the franking privilege have long been used to convey official governmental information, and the government has maintained direct control over the messages conveyed. More importantly, unlike the trademark office, neither the Michigan House nor its Business Office have a monopoly on licensing the particular speech of its members. All legislators, including Maddock, can speak at will about their personal views as long as they pay for it themselves. Any government licensing system, whether Trademark or otherwise, presents entirely different considerations. *Id.* at 239 ("Holding that the registration of a trademark converts the mark into government speech would constitute a huge and dangerous extension of the government speech doctrine. . . . [O]ther systems of government registration could easily be characterized in the same way."). Opening Michigan's messaging privilege to private expression would force taxpayers to subsidize messages in which they have no interest and with which they may personally disagree. The Court declines Maddock's invitation to so distort the historic and limited messaging privilege.

The First Amendment does not apply to the proposed speech at issue here.

### C. Even if the Printing Rules and Guidelines are not Government Speech, they are still Constitutional.

The Defendants argue that even if the Printing Rules and Guidelines do regulate private expression, rather than government speech, they still do not violate the First Amendment.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. AMEND. I. But here, the Printing Rules and Guidelines do not restrict Maddock's freedom of speech; Maddock has demonstrated that he communicates his personal and partisan views on social media without any interference from the defense. The Printing Rules and Guidelines, instead, regulate what the government will or will not subsidize. And the Supreme Court of the United States has "held in several contexts that a legislature's decision not to subsidize

the exercise of a fundamental right does not infringe the right." *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549 (1983).

The Printing Rules and Guidelines restrict only the use of state subsidized funds—not private funds—to engage in political speech. The Supreme Court of the United States has held that the government can "make content-based distinctions when it subsidizes speech" unless the restrictions are the product of viewpoint discrimination. *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188–89 (2007). Accordingly, if the restrictions are deemed viewpoint-neutral, rational basis review applies. *Am. Ass'n of Pol. Consultants v. U.S. SBA*, 613 F. Supp. 3d 360, 368 (D.D.C. 2020) (citing *Ysura v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359, (2009)).

Here, the Printing Rules and Guidelines regulate content, not viewpoint. The Rules and Guidelines repeatedly remind legislators that the messaging privilege and the equipment to publish subsidized messages, are reserved for official legislative business. The Printing Guidelines provide: "The Legislative Service Bureau's printing and mailing equipment shall be used *for official business only*." (ECF No. 1-3, PageID.26) (emphasis added). And they prohibit "[c]omments critical of the legislature, legislators, or other individuals," and comments that "[i]mpugn motives of legislators or other individuals." (*Id.*) Plus, they prohibit speech that act as mere "[s]olicitations of political support for a legislator or any person or any political party" showing that these restrictions are not limited to negative and critical comments. (*Id.*) Contrary to Maddock's claims, whether the Printing Rules and Guidelines prohibit speech boils down to one question: Does the communication involve official governmental business?

These restrictions uphold the privilege's important purpose of keeping the relationship between elected officials and their constituents informed and transparent. The privilege's purpose has never been to serve as a conduit for political attacks or partisan advocacy. Here, the Printing

Rules and Guidelines apply reasonable and viewpoint neutral standards to advance this important interest, which easily satisfies a rational basis test for the regulations. The Court's proper role in such a matter is not to serve as the functional equivalent of an NFL Art McNally Gameday Central review of every application of those reasonable regulations. "It is not this Court's function to examine the policing efforts of committees created by [a state legislature] to deal with the particular types of concerns raised by plaintiffs in this case with an eye to compel even more refined standards and closer examination." *Common Cause v. Bolger*, 574 F. Supp. 672, 685 (D. D.C. 1982) (three judge panel examining federal franking privilege).

The Court finds that the Printing Guidelines and Rules are rationally related to the privilege's historic function and purpose and therefore pass First Amendment muster independent of the government speech analysis.

**III. Qualified Immunity**

Maddock sues the Individual Defendants in their individual capacities, too. The Individual Defendants assert qualified immunity as a defense. As already noted, plaintiff has only included allegations of personal involvement sufficient to state a *Twombly*-plausible claim against one of them. But more generally, qualified immunity applies here to preclude liability against any and all of the individual defendants.

Generally, "government officials are entitled to some form of immunity from suits for damages." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). So, "government officials" who "perform[] discretionary functions" receive qualified immunity, which protects them "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. More simply, "[officials] are entitled to qualified immunity . . . unless (1) they violated a federal statutory or

constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quotation mark omitted). This Court can address these requirements in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If one is lacking, there is no need to address the other. *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021). And here, as the Court just established, Maddock has not pleaded an actionable constitutional violation. The Defendants, thus, have qualified immunity from Maddock's individual capacity suits.

## CONCLUSION

In our society, "one man's vulgarity is another's lyric." *Cohen v. California,* 403 U.S. 15, 25 (1971). Representative Maddock is free to praise or pillory through private expression. But he may not do so under the legislature's seal and with the taxpayer's purse. Like all Michigan lawmakers, he must stick to matters of "official legislative business" when he speaks through Michigan's messaging privilege and must use his own funds to finance his personal views. Nothing about that offends the First Amendment to the Constitution of the United States.

Accordingly**, IT IS ORDERED** that the Court **GRANTS** the Defendants' Motion to Dismiss (ECF No. 11) the federal claims in Plaintiff's Complaint (ECF No. 1). This moots Plaintiff's Motion for Preliminary Injunction (ECF No. 3). Moreover because the Court has disposed of all federal claims, the Court denies supplemental jurisdiction over the state law claims and dismisses those without prejudice. 28 U.S.C. § 1367(c)(3).

A separate Judgment will enter.

Dated: December 19, 2024

/s/ Robert J. Jonker
ROBERT J. JONKER
UNITED STATES DISTRICT JUDGE